IMAPIZZA, LLC,

        *Plaintiff*,

    v.

AT PIZZA LIMITED *et al.*,

        *Defendants*.

Civil Action No. 17-2327 (TJK)

## MEMORANDUM OPINION AND ORDER

Plaintiff IMAPizza, LLC ("IMAPizza") operates a chain of pizza restaurants under the name "&pizza." Defendants—a company called At Pizza Limited ("At Pizza") and its alleged owners, Bhasker Dhir and Rupert Lyle—plan to operate a similar pizza restaurant called "@pizza." IMAPizza is understandably upset, and thinks that Defendants have improperly coopted the name and design of its restaurants.

But there's a catch: all of IMAPizza's restaurants are located in the Eastern United States, while Defendants' restaurant is located in Scotland. Defendants have filed a motion to dismiss (ECF No. 18) on a variety of grounds, most of which reflect the same general argument: IMAPizza has improperly brought this lawsuit in an American court and (mostly) under American law, while it should have been brought in the United Kingdom under that country's laws.

As is explained below, the Court largely agrees with Defendants. To the extent that IMAPizza brings claims under federal law, it improperly seeks to apply our laws to conduct that occurred overseas. The one claim it brings under District of Columbia law (alleging that Defendants trespassed by entering &pizza restaurants) is meritless. Those claims will be dismissed. The Court will also order the parties to brief whether the remaining claim (under United Kingdom law) should be dismissed under the doctrine of *forum non conveniens*.

Finally, IMAPizza will also be required to submit an affidavit with sufficient facts to establish its citizenship for diversity purposes.

## I.      Factual and Procedural Background

IMAPizza, from its headquarters in the District of Columbia (the "District"), operates a restaurant chain called &pizza in the District and other locations in the Eastern United States. Compl. ¶¶ 6, 11.[1]  "&pizza is an anti-establishment establishment" that prides itself on its "creative pies and craft beverages, localized shop design, and the strength, unity and vibe of its living-wage-paid, ampersand-tattooed" employees.  Compl. ¶ 12.

IMAPizza claims that its "trademarked name" is just one aspect of its "unique commercial impression."  *Id.* ¶ 13.  &pizza has other distinctive features as well, such as "an elongated oval skinny pizza design," "elongated rectangular skinny boxes," "slogans that include 'LOVE&pizza' and 'YOU&pizza,'" a set of "four core values," and employees that are referred to as its "Tribe."  *Id.* ¶¶ 15-16.  IMAPizza has also submitted copyright applications for the "architectural and interior design plans" of its restaurants, "including the layout, and look and feel of its locations."  *Id.* ¶ 35.

Lyle and Dhir reside in, and are citizens of, the United Kingdom.  *Id.* ¶¶ 8-9. According to IMAPizza, they are "controlling owner[s] and director[s]" of At Pizza, the corporate entity (organized under the laws of the United Kingdom) through which they operate the @pizza business.  *Id.* ¶¶ 7-10.

---

[1] In considering the instant motion, the Court has considered all relevant parts of the record including: ECF No. 1 ("Compl."); ECF No. 18 ("Defs.' Br."); ECF No. 29 ("Dhir Decl."); ECF No. 29-1 ("Lyle Decl."); ECF Nos. 20-1 to 20-8 (exhibits to Lyle Declaration); ECF No. 23 ("Pl.'s Opp'n"); ECF No. 23-1 ("Wagner Decl."); ECF No. 23-2 ("Wagner Decl. Ex. 1"); ECF No. 26 ("Defs.' Reply"); ECF No. 37 ("Pl.'s Surreply").  The Court has considered the parties' affidavits and other materials outside the pleadings only when evaluating personal jurisdiction.

After "tour[ing] a number of &pizza locations in Washington, D.C.," Lyle allegedly "[r]ealiz[ed] the uniqueness of &pizza's restaurant chain" and decided to copy it. *Id.* ¶ 17. In October 2015, Lyle incorporated a private limited company called "& Pizza Limited" under the laws of the United Kingdom. Wagner Decl. Ex. 1, at 3-9. In June 2016, he renamed the business At Pizza. *Id.* at 10-12. IMAPizza alleges that Dhir, at Lyle's direction, also "took numerous trips to visit the Washington, D.C. locations of &pizza" to study the restaurants. Compl. ¶ 17. During their visits, Lyle and Dhir allegedly "entered into &pizza's Washington, D.C. locations masquerading as customers, took extensive pictures (not identifying themselves as the competition), accessed all parts of the restaurant that they could to observe its design, and returned to Scotland, U.K. with this copyrighted information." *Id.* ¶ 25. They also downloaded photographs of &pizza restaurants from websites operating on servers located in the United States, including "yelp.com" (a restaurant review website) and "flydulles.com" (the website for the Dulles International Airport). *Id.* ¶ 39. IMAPizza claims that these downloads included "at least three pictures for which [IMAPizza] owns the copyrights in the pictures themselves (in addition to the architectural and interior designs they depict)." *Id.* ¶ 40.

For their part, Lyle and Dhir describe their travel to the United States somewhat differently in declarations they have submitted. Lyle admits that he was inspired by American restaurants like &pizza to start his own pizza business, but claims that he came across the restaurant by happenstance during a family vacation in July 2015—which was the only time he visited an &pizza restaurant. *See* Lyle Decl. ¶ 5. He denies having instructed Dhir to visit the United States. *Id.* ¶ 12. For his part, Dhir admits to having visited the United States once, in August 2017, as part of his research for the opening of @pizza. Dhir Decl. ¶¶ 8, 10. He claims, however, that he visited many different restaurants in two different cities during the trip, and was

not fixated on &pizza. *Id.* ¶¶ 8-9. He also claims that he took pictures only for "purely personal" reasons, to "look for new ideas" for home-cooked meals with his family. *Id.* ¶ 9.

IMAPizza claims that Lyle and Dhir used the information they gathered to create "copycat" restaurants "possessing the same look and feel" as &pizza. Compl. ¶ 25. In designing @pizza, they "copied &pizza's architectural and interior designs." *Id.* ¶ 38. They also copied other distinctive features of &pizza, such as the oval shape of the pizza, &pizza's slogans, and "the promotion of its staff as 'the Squad' or 'the Pack'" (similar to &pizza's "Tribe"). *Id.* ¶ 53. And they chose a trademark, @pizza, that was extremely similar to &pizza. *Id.* Dhir and Lyle also allegedly used photographs of &pizza (including the three photographs for which IMAPizza owns the copyrights) in a "marketing deck circulated by @pizza to its business partners," effectively passing off &pizza's unique designs as their own. *Id.* ¶¶ 26-29. (Dhir and Lyle claim that they used this document, which they describe as a "mood board," only "during the recruitment of a General Manager" and never for marketing purposes. Lyle Decl. ¶ 11; Dhir Decl. ¶¶ 5-7.) When IMAPizza demanded that Defendants cease and desist from this conduct, they refused. Compl. ¶¶ 30-31. In fact, they responded that Lyle or Dhir "would be personally escorting their general manager to Washington, D.C. so he or she could also carefully observe &pizza's design, operation and marketing." *Id.* ¶ 32. As of the filing of the complaint, Defendants planned to launch the first @pizza location in November 2017 in Edinburgh, Scotland. *Id.* ¶ 33.

IMAPizza alleges that these acts have caused an effect on U.S. commerce. It claims that a large number of U.S. tourists visit Edinburgh, Scotland, every year, and that they "are likely to be confused as to an association or sponsorship between &pizza and @pizza." *Id.* ¶ 65(a). In addition, "a substantial number of university students in Edinburgh come from U.S. states in

which &pizza is located" and will experience similar confusion. *Id.* ¶ 65(b). IMAPizza also alleges that a "potential business partner of @pizza has contacted &pizza to report the infringing use" of &pizza's trademark and "frustration experienced as a result of the potential partner actually being confused into believing that @pizza was affiliated with the well-established &pizza." *Id.* ¶ 22.

IMAPizza filed this case in November 2017. It brings five causes of action. The first, under the Copyright Act, 17 U.S.C. § 101 *et seq.*, alleges that Defendants have infringed IMAPizza's copyrights in the architectural works and three photographs mentioned above. Compl. ¶¶ 34-47. The second cause of action, for "passing off" under the common law of the United Kingdom, alleges that Defendants have improperly traded on the goodwill associated with IMAPizza's distinctive trademark and other features, thereby harming IMAPizza. *Id.* ¶¶ 48-61. The third and fourth causes of action, for "trademark infringement" and "unfair competition," respectively, bring similar claims under the Lanham Act, 15 U.S.C. § 1051 *et seq.* Compl. ¶¶ 62-78. The fifth and final cause of action alleges that Defendants committed trespass under District of Columbia law when they entered &pizza restaurants without permission for the purpose of stealing IMAPizza's intellectual property. *Id.* ¶¶ 79-87.

Defendants have moved to dismiss on several grounds. Among other things, they have moved to dismiss all claims except the trespass claim for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). Defs.' Br. at 10-13. They have also moved to dismiss all claims except the "passing off" claim for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Defs.' Br. at 13-21. In addition, Defendants' reply raised, for the first time, the issue of dismissal under the doctrine of *forum non conveniens*. Defs.' Reply at 25. The Court granted IMAPizza leave to file a surreply to address this new ground for dismissal, along

with two other issues that Defendants raised for the first time in their reply.  *See* ECF No. 36

(order); Pl.'s Surreply.  Both parties have requested oral argument on the motion.  Defs.' Br. at

22; Pl.'s Opp'n at 36.  The Court finds, in its discretion, that oral argument would not be helpful

to resolution of the motion, and therefore denies their request.  LCvR 7(f).

## II.    Legal Standard

### A.    Motion to Dismiss for Lack of Personal Jurisdiction (Rule 12(b)(2))

The plaintiff bears the burden "to 'make a *prima facie* showing of the pertinent

jurisdictional facts' to survive a motion to dismiss for lack of personal jurisdiction."  *Livnat v.

Palestinian Auth.*, 851 F.3d 45, 56-57 (D.C. Cir. 2017) (quoting *First Chi. Int'l v. United Exch.

Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988)).  "'Conclusory statements' or a 'bare allegation of

conspiracy or agency' do not satisfy this burden."  *Id.* at 57 (quoting *First Chi. Int'l*, 836 F.3d at

1378-79).  Rather, the plaintiff "must allege specific acts connecting [each] defendant with the

forum."  *Second Amendment Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001)

(quoting *First Chi. Int'l*, 836 F.3d at 1378).  "[T]o establish a prima facie case, plaintiffs are not

limited to evidence that meets the standards of admissibility . . . .  Rather, they may rest their

argument on their pleadings, bolstered by such affidavits and other written materials as they can

otherwise obtain."  *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005).  "When deciding

personal jurisdiction without an evidentiary hearing . . . , the 'court must resolve factual

disputes in favor of the plaintiff' . . . ."  *Livnat*, 851 F.3d at 57 (quoting *Helmer v. Doletskaya*,

393 F.3d 201, 209 (D.C. Cir. 2004)).  But the Court need not accept inferences unsupported by

the facts.  *Id.*[2]

---

[2] Some opinions in this District, including one cited by Defendants, state that a court "need not
accept the plaintiff's allegations as true and 'may . . . weigh affidavits and other relevant
matter[s] to assist in determining the jurisdictional facts.'"  *E.g.*, *Bigelow v. Garrett*, 299 F.

If facts material to the Court's exercise of personal jurisdiction over the defendant remain in dispute, the Court must adopt appropriate procedures to resolve them.  *Cf. Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197-98 (D.C. Cir. 1992) (subject matter jurisdiction).  Typically this must occur before turning to the merits, *see Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 510-11 (D.C. Cir. 2018), unless the merits and jurisdiction are intertwined, *cf. Herbert*, 974 F.2d at 198 (subject matter jurisdiction).  One available procedure is jurisdictional discovery, which the Court has discretion to order when presented with "'a good faith belief that such discovery will enable [the plaintiff] to show that the court has personal jurisdiction over the defendant,'" as opposed to "mere conjecture or speculation."  *FC Inv. Grp. v. IFX Markets, Ltd.*, 529 F.3d 1087, 1093-94 (D.C. Cir. 2008) (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998)).  The Court may also hold an evidentiary hearing to determine, by a preponderance of the evidence, whether personal jurisdiction exists.  *See Mwani*, 417 F.3d at 7.

### B.    Motion to Dismiss for Failure to State a Claim (Rule 12(b)(6))

"A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a plaintiff's complaint; it does not require a court to 'assess the truth of what is asserted or determine whether a plaintiff

---

Supp. 3d 34, 41 (D.D.C. 2018) (quoting *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 127 (D.D.C. 2004)); *see* Defs.' Br. at 8.  But this language describes the Court's role if personal jurisdiction is decided at a later stage in the proceedings, not how to evaluate the plaintiff's *prima facie* showing.  At this stage, plaintiffs "may rest their arguments on their pleadings," *Mwani*, 417 F.3d at 7, and the Court "must resolve factual disputes in favor of the plaintiff," *Livnat*, 851 F.3d at 57.  *See also AlixPartners, LLP v. Brewington*, 836 F.3d 543, 548-49 (6th Cir. 2016) ("[T]he pleadings and affidavits submitted must be viewed in a light most favorable to the plaintiff, and the district court should not weigh the controverting assertions of the party seeking dismissal." (alteration in original) (quoting *Air Prod. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007)) (internal quotation marks omitted)); 5B Charles Alan Wright & Arthur A. Miller, *Federal Practice and Procedure* § 1351 (3d ed. 2004) ("[F]or purposes of such a [*prima facie*] review, federal courts will, as they do on other motions under Rule 12(b), take as true the allegations of the nonmoving party with regard to the jurisdictional issues and resolve all factual disputes in his or her favor.").

has any evidence to back up what is in the complaint.'" *Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C. Cir. 2017) (quoting *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002)). "In evaluating a Rule 12(b)(6) motion, the Court must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). "But the Court need not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations." *Id.* "To survive a motion to dismiss, a complaint must have 'facial plausibility,' meaning it must 'plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In deciding a motion to dismiss under Rule 12(b)(6), the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (alteration in original) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)).

## III.    Analysis

The Court will begin—as it must—by examining Defendants' argument that the Court lacks personal jurisdiction over them. While this is a close question, the Court concludes that IMAPizza has made a *prima facie* showing of jurisdiction as is required to avoid dismissal at this stage. The Court will then turn to Defendants' argument that IMAPizza has failed to state a claim under the Copyright Act, the Lanham Act, and the common law of trespass, concluding that Defendants are correct and those claims must be dismissed. The Court further concludes that it lacks an adequate record to dismiss IMAPizza's remaining claim (for "passing off" under

the law of the United Kingdom) under the doctrine of *forum non conveniens*. The Court will order the parties to propose a schedule for briefing a renewed motion to dismiss on that ground. Finally, in order to ensure that it has diversity jurisdiction over the "passing off" claim, the Court will require IMAPizza to submit an affidavit establishing its citizenship.

### A. Personal Jurisdiction

Defendants argue that the Court lacks personal jurisdiction to hear IMAPizza's intellectual-property claims (that is, everything except the trespass claim, which they concede the Court has jurisdiction to hear). *See* Defs.' Br. at 10-13; Defs.' Reply at 20-25. Personal jurisdiction is not a mere technicality, but "'an essential element of the jurisdiction of a district . . . court,' without which the court is 'powerless to proceed to an adjudication.'" *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (quoting *Emp'rs Reins. Corp. v. Bryant*, 299 U.S. 374, 382 (1937)). The Court must address this issue before turning to the merits of IMAPizza's claims. *See Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 510-11 (D.C. Cir. 2018).

There are two types of personal jurisdiction. Under the first type, known as general or "all-purpose" jurisdiction, courts located where defendants are at "at home" may exercise jurisdiction over *any* claim against them. *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014). IMAPizza has wisely elected not to rely on general jurisdiction in this case, because Defendants—all of whom reside in the United Kingdom—cannot be considered "at home" anywhere in the United States. The second type, known as specific or "case-linked" jurisdiction, exists when there is a connection between the forum and the facts of the case. *Walden v. Fiore*, 134 S. Ct. 1115, 1121 n.6 (2014). This case concerns the second type.

To establish specific personal jurisdiction, IMAPizza must show that jurisdiction is proper under both (1) the District of Columbia's long-arm statute and (2) the U.S. Constitution's

Due Process Clause. *See* Fed. R. Civ. P. 4(k)(1)(A); *Walden*, 134 S. Ct. at 1121; *Forras v. Rauf*, 812 F.3d 1102, 1105-06 (D.C. Cir.), *cert. denied*, 137 S. Ct. 375 (2016).[3] As explained below, the Court concludes, drawing all inferences in IMAPizza's favor from the instant record, that it has met its burden of establishing a *prima facie* showing of personal jurisdiction over Defendants.

### 1.    District of Columbia Long-Arm Statute

The District of Columbia long-arm statute provides, among other things, for "personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's":

> (1) transacting any business in the District of Columbia;
>
> (2) contracting to supply services in the District of Columbia;
>
> (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; [or]
>
> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia . . . .

D.C. Code § 13-423(a)(1)-(4). The plaintiff must identify which prong of the long-arm statute she is relying on as the basis for jurisdiction. *See FC Inv. Grp. LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1095-96 (D.C. Cir. 2008). Here, IMAPizza has relied solely on § 13-423(a)(1). *See*

---

[3] IMAPizza also argues, alternatively, that jurisdiction would be proper under Rule 4(k)(2) even if the local long-arm statute did not apply. *See* Pl.'s Opp'n at 29. The Court need not address this argument.

Pl.'s Opp'n at 28-33. Therefore, the Court will not consider the other subsections of the statute for purposes of this motion.[4]

To invoke § 13-423(a)(1), the plaintiff must first make a threshold showing "that the defendant has purposefully engaged in some type of *commercial or business-related activity* directed at District residents." *Holder v. Haarmann & Reimer Corp.*, 779 A.2d 264, 270-71 (D.C. 2001) (emphasis added). Instead, IMAPizza skips ahead to the due process analysis, relying on cases stating that, under this subsection, "the statutory and constitutional jurisdictional questions, which are usually distinct, merge into a single inquiry." Pl.'s Opp'n at 28 (quoting *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995)). But IMAPizza overlooks the word "usually." As the D.C. Circuit has explained, § 13-423(a)(1) extends to the limits of due process only "for cases that fit within [the provision's] description." *Forras*, 812 F.3d at 1106 (quoting *Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987) (R.B. Ginsburg, J.)); *see also Mouzavires v. Baxter*, 434 A.2d 988, 993 (D.C. 1981) (explaining that § 13-423(a)(1) "covers *any transaction of business in the District of Columbia* that can be reached jurisdictionally without offending the due process clause" (emphasis added)).

The case law does not precisely delineate the boundaries of "commercial or business-related activity" falling within the statute. Certainly, it covers "business transactions" in the everyday sense of commercial deal-making activities like negotiating or performing contracts. *See, e.g.*, *Helmer v. Doletskaya*, 393 F.3d 201, 206-07 (D.C. Cir. 2004); *Xie v. Sklover & Co.*, 260 F. Supp. 3d 30, 41 (D.D.C. 2017). In fact, "contractual activities" are so central to § 13-

---

[4] IMAPizza briefly mentions § 13-423(a)(3) and (4), as well. *See* Pl.'s Opp'n at 31 n.9. The Court will not consider this argument, which is raised only in passing, and in a footnote. *See Paleteria la Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 247 F. Supp. 3d 76, 101 (D.D.C. 2017) (citing *Armstrong v. Geithner*, 608 F.3d 854, 858 n.** (D.C. Cir. 2010)).

423(a)(1) that, even when they occur outside the District of Columbia, they may be deemed to occur "in the District" if they "cause a consequence here." *Mouzavires*, 434 A.2d at 992. The statute has also been extended to advertising in the District, *see Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 330-32 (D.C. 2000) (en banc), operating an office in the District, *see Wilson v. Wilson*, 785 A.2d 647, 650 (D.C. 2001), and holding a board meeting in the District, *see Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 727-28 (D.C. 2011). The District of Columbia Court of Appeals has held that a Pennsylvania attorney "transact[ed] business" in the District by representing a Florida corporation before the U.S. Patent and Trademark Office. *See Lex Tex Ltd., Inc. v. Skillman*, 579 A.2d 244, 249 (D.C. 1990). Courts have also held that employment decisions made in the District (such as a decision to fire an employee) constitute business transactions. *See, e.g.*, *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 52 (D.D.C. 2009), *aff'd sub nom. Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011).

By contrast, courts have declined to extend § 13-423(a)(1) to conduct that is not meaningfully "business-related." For example, participating outside the District in a criminal conspiracy that affects District residents does not necessarily constitute "transacting business" in the District. *Holder*, 779 A.2d at 274-75. Indeed, not even "the *in-state* commission of a tort is defined as 'doing business.'" *Id.* at 275 n.10 (emphasis added). Nor do professional activities that physically take place in the District necessarily constitute "business transactions" within the meaning of the statute. For example, in *Etchebarne-Bourdin v. Radice*, 982 A.2d 752 (D.C. 2009), the plaintiffs brought malpractice claims against doctors who had treated them in Virginia. *Id.* at 755-56. The plaintiffs claimed that the doctors had "transact[ed] business" in the District by attending continuing-medical-education courses there. *Id.* at 759. The District of Columbia Court of Appeals concluded that these professional activities did not constitute

"transacting business," and noted that the doctors had not actively solicited patients in the District. *Id.* at 759-60. Purely personal matters may also not be sufficiently "business-related" to fall within the statute; one court has held, for example, that a separation agreement executed by a husband and wife in the District did not qualify. *See Capel v. Capel*, 272 F. Supp. 3d 33, 39 (D.D.C. 2017).

Defendants argue, with some force, that their contacts with the District do not resemble traditional business transactions. *See* Defs.' Reply at 21-22. IMAPizza seeks to rely on its allegation that Defendants targeted their acts of infringement, which occurred in the United Kingdom, at IMAPizza in the District. Pl.'s Opp'n at 30-32. But tortious conduct by a nonresident outside the District is not "transacting any business in the District," even if it affects a District resident. *See Holder*, 779 A.2d at 274-75. And of course, At Pizza never conducted its primary business (selling pizza) in the District. Nor is it alleged to have advertised here.

Nonetheless, the Court concludes that, when all factual disputes are resolved and inferences are drawn in IMAPizza's favor, some of Dhir's contacts with the District qualify as business transactions under § 13-423(a)(1). Even in Defendants' own account, Dhir traveled to the District for a business purpose: to conduct research for At Pizza about other pizza restaurants. *See* Dhir Decl. ¶¶ 8-9. For a start-up like At Pizza, such research could be considered an important business activity. This performance of business duties in the District appears to constitute "transacting business" within the meaning of the statute. *Cf. Lex Tex*, 579 A.2d at 249 (holding out-of-state lawyer was "transacting business" by representing out-of-state client in District). Moreover, there was at least some kind of "transaction" in the traditional sense, as Dhir was a customer of IMAPizza during his visit. *See* Defs.' Reply at 21.

Defendants also argue that these contacts cannot be attributed to Lyle and Dhir, because they acted solely in their capacities as officers of At Pizza. *See id.* at 24-25. It is true that, under District of Columbia law, a plaintiff cannot establish personal jurisdiction over a corporate officer based solely on the corporation's conduct. *See Flocco v. State Farm Mut. Auto. Ins. Co.*, 752 A.2d 147, 162 (D.C. 2000). But this "fiduciary shield" rule is not absolute. *Id.* at 163 n.20. It does not necessarily protect corporate officers who have personally benefited from their own misconduct. *See Family Fed'n for World Peace v. Hyun Jin Moon*, 129 A.3d 234, 243-44 (D.C. 2015). Similarly, it does not protect corporate agents who were not mere employees, but high-ranking officers responsible for the corporate policies that gave rise to the plaintiff's claims. *See Nat'l Cmty. Reinv. Coal. v. NovaStar Fin., Inc.*, 604 F. Supp. 2d 26, 30-31 (D.D.C. 2009). Here, Dhir personally had contacts with the District. *See* Dhir Decl. ¶ 8-9. And Dhir's contacts can be attributed to Lyle because, under IMAPizza's version of the facts, Dhir traveled to the District at Lyle's direction, *see* Compl. ¶ 17, from which one could infer he was Lyle's "agent" under the long-arm statute. *See* D.C. Code § 13-423(a); *Smith v. Jenkins*, 452 A.2d 333, 335-36 (D.C. 1982) (explaining that generally "an agency relationship results when one person authorizes another to act on his behalf subject to his control, and the other consents to do so"). *But see* Lyle Decl. ¶ 12. Moreover, Lyle and Dhir allegedly exercise control over At Pizza and caused it to engage in the conduct at issue, making them more than mere employees. *See* Compl. ¶¶ 8-9.

Of course, it is not enough for IMAPizza to show that Defendants engaged in business transactions in the District. It must also show that its claims "aris[e] from" these business transactions. D.C. Code § 13-423(b). This requirement reflects the fact that § 13-423 provides for only *specific* personal jurisdiction, which requires the defendant's contacts with the forum to be related to the plaintiff's lawsuit. District of Columbia law sets a relatively low bar for suit-

relatedness, requiring only a "discernible relationship" between the defendant's contacts and the plaintiff's claims. *Jackson v. George*, 146 A.3d 405, 412 (D.C. 2016) (quoting *Shoppers*, 746 A.2d at 329). "[T]he claim ha[s] to be related to or substantially connected with" the business transactions in question, such that "it is reasonably foreseeable that, as a result of" the transactions, the defendant "could be sued in the District on a claim similar to that filed by" the plaintiff. *Shoppers*, 746 A.2d at 335-36. It is not necessary, where jurisdiction is based on § 13-423(a)(1), that the claim be contractual in nature. For example, in *Shoppers*, a slip-and-fall in a Maryland grocery store was held to "arise from" advertising in the District. 746 A.2d at 336.

There is no need to belabor the question of suit-relatedness under District of Columbia law. The "arising from" requirement "operates as a due process check on the reach or scope of the 'transacting business' provision of the long-arm statute." *Id.* at 333. The District of Columbia Court of Appeals has concluded that the "discernible relationship" test is sufficient to satisfy the U.S. Constitution's Due Process Clause. As will be discussed below, other courts have applied different tests, and the "discernible relationship" test is the least demanding—that is, it requires the loosest fit between a defendant's forum contacts and a plaintiff's claim. Therefore, if Defendants' alleged business transactions can support personal jurisdiction under the Due Process Clause, they necessarily satisfy the "arising from" requirement in § 13-423(b) as well. The Court therefore turns to the due process analysis.

## 2. Due Process Clause

The Due Process Clause prohibits a court from exercising jurisdiction over a nonresident defendant unless he has "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Walden*, 134 S. Ct. at 1121 (alteration in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). If the plaintiff relies on a theory of specific jurisdiction, this "minimum contacts" analysis "focuses on

'the relationship among the defendant, the forum, and the litigation.'" *Id.* (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). "[T]he *defendant's* suit-related conduct must create a substantial connection with the *forum* State." *Id.* (emphases added). That is, the defendant—not the plaintiff—must create the relevant contacts. *See id.* at 1122. Those contacts must be with the forum, not merely with its residents. *See id.* And there must be "a connection between the forum and the specific claims at issue." *Bristol-Myers Squibb v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1781 (2017).

IMAPizza has alleged the type of purposeful conduct that could constitute minimum contacts with the District of Columbia. It claims that Dhir, at Lyle's direction, paid multiple visits to the District. *See* Compl. ¶ 17. "[P]hysical entry into the [jurisdiction]—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." *Walden*, 134 S. Ct. at 1122. Defendants do not dispute that these contacts adequately support the Court's jurisdiction to hear IMAPizza's trespass claim. Defs.' Reply at 24.

The real issue in this case is not whether Defendants had purposeful contacts with the District, but whether those contacts are sufficiently related to IMAPizza's intellectual-property claims. As Judge Moss recently explained, the test for suit-relatedness under the Due Process Clause remains an unsettled question in this Circuit. *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 26 (D.D.C. 2017). Other courts have generally adopted one of three approaches. The first requires the forum contacts to be something like the "proximate cause" of the plaintiff's claim. *Id.* The second imposes a looser standard more akin to factual (or "but-for") causation. *Id.* The third is the "discernable relation" test (the same one the District of Columbia Court of Appeals has adopted). *Id.* at 26-27. The first test is the most demanding, and the third the least.

If IMAPizza's *prima facie* showing satisfies the demanding "proximate cause" test, then there is no need for the Court to decide, at this time, which of these three tests is the correct one. And that is in fact the case.

The First Circuit's opinion in *Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.m.b.H.*, 295 F.3d 59 (1st Cir. 2002), provides a helpful illustration of the "proximate cause" test in action. There, the defendants manufactured figurines in Germany and shipped them to Massachusetts for sale. *Id.* at 62. The plaintiff claimed that it owned a partial share of the copyrights in the design of the figurines, meaning that the defendants owed the plaintiff a share of their profits. *Id.* at 61-62. On the basis of the Massachusetts sales, the plaintiff asserted that the federal court in Massachusetts had personal jurisdiction over its claim. *Id.* at 62. The lower court determined that the plaintiff's claim did not "arise from" these sales, but rather from transactions in Europe by which the plaintiff had obtained its ownership interest in the copyrights. *See id.* at 62, 65. The First Circuit reversed. It concluded, first, that the "generation of profits is certainly a 'but for' cause of [the plaintiff's] claim." *Id.* at 65. And it also concluded that "the shipment of figurines into Massachusetts does play a close and significant role in [the plaintiff's] claims since it is the source of most of the profits in dispute." *Id.* And perhaps most critically, it rejected the proposition that the existence of other, more significant contacts abroad detracted from the defendants' contacts in Massachusetts. "That events elsewhere *also* bear upon the claim, and may indeed be the main (or only) subjects of actual dispute at trial, does not negate the existence of minimum Massachusetts contacts related to the claim." *Id.*

Here, many of the key facts are undisputed. Lyle admits that he discovered &pizza during a July 2015 trip to the United States. Lyle Decl. ¶ 5. IMAPizza has introduced a

document showing that Lyle initially incorporated his business as "& Pizza Limited" in the United Kingdom just three months later, on October 8, 2015. Wagner Decl. Ex. 1, at 3-9. In 2016, Lyle changed the name to At Pizza. *Id.* at 10-12. And Dhir admits traveling to the United States as part of his "due diligence and research process" for At Pizza in August 2017. Dhir Decl. ¶ 8. Dhir also admits that he visited an &pizza location in the District on the trip and took pictures of the restaurant. *Id.* ¶¶ 8-9. That occurred just three months before the planned opening of the first @pizza restaurant in November 2017. *See* Compl. ¶ 33.

When all reasonable inferences are drawn in IMAPizza's favor, one could conclude that Defendants' contacts with the District were an indispensable part of a plan to copy the ingredients of &pizza's success. The fact that Lyle incorporated "& Pizza Limited" just months after learning about &pizza supports IMAPizza's assertion that he was, from the outset, on a "copycat mission" to replicate its restaurants. Compl. ¶ 52; *see id.* ¶ 17. And that fact also supports the inference that Dhir's trip to the District was, indeed, focused on copying &pizza (not merely for general background research). This narrative is consistent with additional facts that Defendants appear to dispute (but which the Court must resolve in IMAPizza's favor at this stage), such as IMAPizza's allegation that Defendants made additional visits to the District. *See id.* ¶ 17. In light of these factual allegations and inferences, one could conclude that Defendants' alleged scheme—which involved copying not just the "&pizza" trademark, but also the overall "look and feel" of the restaurants, *id.* ¶¶ 35, 74—required these additional trips to conduct detailed study, up close and in person, such that the trips were a "but-for" cause of the alleged acts of infringement in the United Kingdom.

In fact, one could also reasonably infer that these contacts resembled a "proximate cause" of IMAPizza's intellectual-property claims. The timing of Dhir's admitted trip—in August

2017, just three months before the planned opening of the first @pizza restaurant in November 2017, *see id.* ¶ 33; Dhir Decl. ¶¶ 8-10—suggests that it "play[ed] a close and significant role" in carrying out the alleged infringement. *Cambridge Literary Properties*, 295 F.3d at 65; *cf. GT Solar Inc. v. Goi*, No. 08-cv-249 (JL), 2009 WL 3417587, at *12 n.29 (D.N.H. Oct. 16, 2009) (noting appropriation of trade secrets in forum could constitute proximate cause of misuse occurring outside forum, given close timing between acquisition of trade secrets and subsequent infringement). Indeed, IMAPizza claims that Lyle and Dhir expressed plans to continue visiting &pizza restaurants in the District in the future (with their general manager) to perfect their scheme. Compl. ¶ 32. It is, of course, quite clear that the immediate cause of IMAPizza's alleged injuries was the infringing conduct that occurred overseas. But "it is common for injuries to have multiple proximate causes." *Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011). As in *Cambridge Literary Properties*, the fact that the main events underlying the claim occurred abroad does not diminish Defendants' contacts with this forum. *See* 295 F.3d at 65.

Defendants might well be right that, under their version of the facts, their contacts with the District are not enough to support personal jurisdiction. Lyle claims that he never directed Dhir to travel to the United States. Lyle Decl. ¶ 12. And for his part, Dhir claims that his travel was aimed at conducting background research on a number of different restaurants—not &pizza specifically—and that some of his activities were for his personal benefit, unrelated to At Pizza's business. Dhir Decl. ¶¶ 8-9. He also claims that he visited &pizza only once, not multiple times. If all that is true, then the relationship between these forum contacts and At Pizza's alleged operation of a "copycat" restaurant seems much more tenuous. But at this stage, the Court must resolve all factual disputes, and draw all reasonable inferences, in IMAPizza's favor. *See Livnat v. Palestinian Auth.*, 851 F.3d 45, 57 (D.C. Cir. 2017).

Finally, Defendants argue that, even if minimum contacts exist, personal jurisdiction would be "unreasonable." Defs.' Reply at 23-24. It is true that, "even after 'it has been decided that a defendant purposefully established minimum contacts within the forum . . . , these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice."'" *Mwani v. bin Laden*, 417 F.3d 1, 14 (D.C. Cir. 2005) (alteration in original) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). The relevant factors are "'the burden on the defendant, the interests of the forum State,' 'the plaintiff's interest in obtaining relief' in the forum State, and the interests of other sovereigns in resolving the dispute." *Daimler*, 134 S. Ct. at 765 (Sotomayor, J., concurring in the judgment) (quoting *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 113 (1987)). It is Defendants' burden to "present a compelling case that the presence of [these] other considerations would render jurisdiction unreasonable." *Mwani*, 417 F.3d at 14 (quoting *Burger King*, 471 U.S. at 477).

It is possible that these considerations may warrant dismissal for lack of personal jurisdiction in this case. But Defendants have not adequately made the case for that result. They rely on the conclusory statement that "the weight of the factors demonstrates it would be unreasonable to impose jurisdiction on the U.K. Defendants." Defs.' Reply at 23. They also make a general argument that Defendants could not have foreseen being haled into this Court, without attention to the specific factors the Supreme Court has identified. *Id.* at 23-24. This is not the "compelling case" that Defendants must make to warrant dismissal on this basis.

\* \* \*

Personal jurisdiction in this case is a close call. When IMAPizza is given the benefit of all disputed facts and reasonable inferences, it has eked out a *prima facie* showing of personal

jurisdiction. But it is unclear whether discovery will bear out all of IMAPizza's claims about Defendants' contacts with the District of Columbia, or if it could prevail at an evidentiary hearing on the matter. Moreover, Defendants may ultimately be able to show that jurisdiction is unreasonable despite their contacts with the District of Columbia.

Still, those are issues for the future. IMAPizza has made out a *prima facie* showing of jurisdiction, and so the Court may proceed to consider Defendants' motion under Rule 12(b)(6).[5]

## B. Failure to State a Claim

Defendants argue that IMAPizza's Copyright Act, Lanham Act, and trespass claims should be dismissed for failure to state a claim. *See* Defs.' Br. at 15-21.[6] The Court agrees.

### 1. Copyright Act (First Cause of Action)

"It is axiomatic that United States copyright law does not apply extraterritorially." *Yount v. Acuff Rose-Opryland*, 103 F.3d 830, 835 (9th Cir. 1996). Defendants argue, among other

---

[5] The Court notes that, in *Kaplan*, the D.C. Circuit recently held that a district court must "assure itself that it has personal jurisdiction before moving on to address the merits of a claim." 896 F.3d at 510. But jurisdictional issues, like merits issues, are adjudicated in stages. *Cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (holding that standing is proved "with the manner and degree of evidence required at the successive stages of the litigation"). It would be pointless to resolve a factual dispute over personal jurisdiction through costly procedural measures—such as discovery or an evidentiary hearing—where the plaintiff does not even state a claim. Thus, if the Court determines that the papers make out a *prima facie* showing of jurisdiction, it may proceed to consider a Rule 12(b)(6) motion to dismiss. *Cf. Mwani*, 417 F.3d at 7 (holding court may enter default judgment based on a *prima facie* showing of personal jurisdiction). Nothing in *Kaplan* is to the contrary.

[6] Defendants also argue that all claims against Dhir and Lyle should be dismissed because IMAPizza improperly seeks to pierce the corporate veil and hold them liable for At Pizza's conduct. *See* Defs.' Br. at 13-15. The Court will not address this argument, because the only claim left after considering their motion is the "passing off" claim under United Kingdom law, and Defendants have addressed this issue only under U.S. law. *See id.* Defendants are free to advance this argument again if the "passing off" claim survives further proceedings on the threshold issues of *forum non conveniens* and personal jurisdiction.

things, that IMAPizza improperly seeks to apply our copyright laws to their foreign conduct. Defs.' Br. at 18-19.[7]  They are correct.

"It is a 'longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'"  *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010) (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)) (internal quotation marks omitted).  "When a statute gives no clear indication of an extraterritorial application, it has none."  *Id.*  And even "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms."  *Id.* at 265.

The D.C. Circuit recently addressed the territorial limits of the Copyright Act in *Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904 (D.C. Cir. 2018).  The court began by considering the Act's "focus."  *Id.* at 913 (quoting *Morrison*, 561 U.S. at 266).  That focus, it concluded, was on infringement of the "exclusive rights" afforded copyright owners under the Act.  *Id.* at 914 (quoting 17 U.S.C. § 106).  Thus, the Copyright Act applies when those rights are infringed in the United States.  *See id.*  The court then applied this principle to an alleged infringement of the plaintiff's exclusive right to publicly perform its audiovisual works (namely, certain television episodes) under 17 U.S.C. § 106(4).  Although the defendant streamed the episodes across the internet from Poland, the court concluded that the performance occurred on viewers' computer screens in the United States.  *See* 883 F.3d at 914.

---

[7] The Court need not address Defendants' remaining arguments to dismiss the copyright claim. Notably, Defendants argue that IMAPizza improperly brought suit before the Copyright Office had issued it copyright registrations, Defs.' Br. at 16-17—raising an issue that the Supreme Court is likely to decide in its coming term.  *See Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 138 S. Ct. 2707 (2018) (granting petition for writ of certiorari).

To bolster its case for applying the Copyright Act to the conduct here, IMAPizza invokes the "predicate act" doctrine adopted by several other courts of appeals. *See* Pl.'s Opp'n at 21. Under this doctrine, if the defendant has committed a domestic act of copyright infringement, and that act has enabled further acts of infringement abroad, then the plaintiff may recover damages for the foreign conduct. *See, e.g.*, *Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 306-07 (4th Cir. 2012). The archetypal example, from a famous opinion by Judge Learned Hand, involved a defendant who illegally copied a motion picture in the United States and then exhibited it overseas. *Id.* (citing *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 52 (2d Cir. 1939)). But assuming that the predicate-act doctrine is viable in this Circuit, it adds nothing to IMAPizza's case absent an allegation that an act of infringement occurred in the United States. *See Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988).

The parties seem to agree that the principal acts of infringement alleged in the complaint occurred overseas. IMAPizza alleges that Defendants' restaurant—located in Scotland—incorporates its copyrighted "architectural and interior designs." Compl. ¶ 43. IMAPizza also alleges that Defendants improperly used copyrighted images in their "marketing material," but never alleges that this marketing material was created or distributed in the United States. *See* Compl. ¶¶ 26-29. And in opposing Defendants' motion, IMAPizza does not argue that these acts occurred in the United States. *See* Pl.'s Opp'n at 21-22. Instead, it points to other acts that supposedly give rise to copyright liability under our laws: (a) Defendants' travel to the United States to access &pizza restaurants; (b) Defendants' taking pictures during those visits; and (c) Defendants' downloading of copyrighted pictures from U.S. servers. *See id.*

But ultimately, IMAPizza's arguments fail.  None of these acts plausibly constituted infringement within the United States.

### a.  Travel to &pizza Restaurants

IMAPizza's first theory is that Defendants, by accessing its copyrighted design elements in the United States, and then returning to the United Kingdom to copy them, committed conduct within the scope of the Copyright Act.  *See id.* at 21.  This theory is meritless.

Access to a copyrighted work is, in a sense, a logical prerequisite to copyright infringement.  Copyright law only protects against "*actual* copying" of copyrighted works.  *See Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1295 (D.C. Cir. 2002) (emphasis added).  That is, if the defendant independently created the allegedly infringing work, without using the plaintiff's work as a model (even subconsciously), then he did not commit infringement. *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 100-01 (2d Cir. 2014).  As a result, infringement is impossible if the defendant has never even been exposed to the plaintiff's copyrighted work.

But that does not mean that access can be equated with infringement.  The D.C. Circuit has made clear that infringement occurs where the defendant violates the plaintiff's exclusive rights under 17 U.S.C. § 106.  *See Spanski*, 883 F.3d at 914.  That is, infringement occurs where the defendant reproduces, adapts, distributes, performs, or displays the copyrighted work.  *See* 17 U.S.C. § 106.  That may bear no relation to the place where the defendant accessed the work. Indeed, access to a copyrighted work may occur years before infringement does.  *See Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 483 (9th Cir. 2000).  It would make no sense to say that a French artist violated U.S. copyright law by painting an infringing work in Paris, simply because he had seen the copyrighted work in a Manhattan gallery months earlier.  (Of course, the artist

might well be liable under French law.)  Unsurprisingly, IMAPizza cites no case holding otherwise.  *See* Pl.'s Opp'n at 21-22.

Therefore, IMAPizza's allegations about where Defendants accessed its copyrighted works cannot support Copyright Act liability.

### b.      Pictures Taken at &pizza Restaurants

IMAPizza also suggests that Defendants committed infringement by taking "extensive pictures" of &pizza restaurants.  *Id.* at 21 (citing Compl. ¶ 25).  While these acts indisputably occurred in the United States, IMAPizza has not plausibly alleged that they constituted copyright infringement.

As Defendants argue, these pictures cannot be infringing as a matter of law.  *See* Defs.' Br. at 19 n.5; Defs.' Reply at 9.  IMAPizza claims that certain design elements of its restaurants constitute architectural works.  *See* Compl. ¶ 35; Pl.'s Opp'n at 18-20.  By statute, taking photographs of an architectural work is not infringement "if the building in which the work is embodied is located in or ordinarily visible from a public place."  17 U.S.C. § 120(a).  &pizza is a restaurant chain, *see* Compl. ¶ 11, and pictures in the complaint portray it as a casual restaurant where customers enter and order from a counter, *see id.* ¶ 27; *see also id.* ¶ 23 (touting &pizza's awards as a "Best Casual" restaurant and "Best Place to Grab a Quick Lunch").  IMAPizza nowhere disputes the obvious and inescapable inference that its restaurants were and are open to the public during normal business hours.  *See* Pl.'s Opp'n.  Thus, because IMAPizza's architectural works are visible from a public place, taking pictures of them cannot be a basis for copyright liability.

### c.    Downloading of Images from U.S. Servers

IMAPizza's final theory is that an act of domestic copyright infringement occurred each time Defendants downloaded images from servers located in the United States.  Pl.'s Opp'n at 21-22 (citing Compl. ¶¶ 39, 43).  But this theory also fails.

As the Ninth Circuit has explained, the transmission of a file across the internet involves two potential copyright violations.  "Both uploading and downloading copyrighted material are infringing acts.  The former violates the copyright holder's right to distribution [under 17 U.S.C. § 106(3)], the latter the right to reproduction [under § 106(1)]."  *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1034 (9th Cir. 2013).  Therefore, where both the uploading and downloading are unlawful (as in the many cases of illegal file-sharing that have come before the federal courts), "Plaintiffs need only show that United States users either uploaded or downloaded copyrighted works; Plaintiffs need not show that a particular file was both uploaded and downloaded entirely within the United States."  *Columbia Pictures Indus., Inc. v. Fung*, No. 06-cv-5578 (SVW) (JCx), 2009 WL 6355911, at *8 (C.D. Cal. Dec. 21, 2009), *aff'd in part, vacated in part on other grounds, and modified in part*, 710 F.3d 1020 (9th Cir. 2013).

But in this case, IMAPizza has not alleged that its pictures were "uploaded" unlawfully.  That is, there is no claim that the websites hosting these pictures committed copyright infringement by distributing pictures of IMAPizza's restaurants.  *See* Compl. ¶¶ 34-47.  And in fact, IMAPizza's complaint suggests that there would be no basis for such a claim.  The websites that hosted these pictures include yelp.com, a well-known site for restaurant reviews, and the website for the Dulles International Airport.  *See id.* ¶¶ 39-40.  IMAPizza presumably wants pictures of its restaurants on these websites for promotional purposes.  It certainly does not contend otherwise.

Instead, IMAPizza alleges only that the receiving end of the transmission—Defendants' downloading of the pictures—was unlawful. *See id.* The Court is somewhat skeptical that copyright infringement occurs when someone merely downloads an image from a reputable, publicly available website. *Cf. Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169-70 (9th Cir. 2007) (holding that automatic copying of images in browser "cache" constituted fair use). Nonetheless, even assuming that could be copyright infringement, there is no plausible allegation that it occurred in the United States.

As mentioned above, an unlawful download violates the plaintiff's exclusive right to reproduce the copyrighted work under 17 U.S.C. § 106(1). *Columbia Pictures*, 710 F.3d at 1034. The question, then, is where the reproduction occurs. The answer is not hard to find. Reproduction consists of making unauthorized "copies" of a copyrighted work. 17 U.S.C. § 106(1). It therefore occurs where the unlawful "copy" is made. *See Update Art*, 843 F.2d at 73. A "copy" is a "material object[] . . . in which a work is fixed," and a "work is 'fixed' in a tangible medium of expression when its embodiment in a copy . . . is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." 17 U.S.C. § 101. "Therefore, the reproduction right is not infringed, even if the defendant embodies the plaintiff's work in a material object, unless such embodiment is of more than transitory duration." 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.02[B][2] (Matthew Bender, Rev. Ed. 2018).

Under this definition, it is plain that the ephemeral transmission of a picture across the internet does not create a "copy." Instead, the "copy" is made where the receiving computer assembles the transmitted information into a complete image that can be "perceived." 17 U.S.C. § 101; *cf. Columbia Pictures*, 2009 WL 6355911, at *8 (holding any unlawful download by a

user in the United States violates the reproduction right). IMAPizza does not allege that Defendants downloaded the images at issue *to* computers located in the United States, merely that the pictures were downloaded *from* U.S. servers. *See* Compl. ¶ 39. That is not enough to allege domestic infringement of the reproduction right under 17 U.S.C. § 106(1). This easily distinguishes two cases, cited by IMAPizza, in which foreign defendants were alleged to have distributed infringing works into the United States, where they were downloaded. *See Liberty Media Holdings, LLC v. Vinigay.com*, No. 11-cv-280 (PHx) (LOA), 2011 WL 7430062, at *5 (D. Ariz. Dec. 28, 2011), *report and recommendation adopted*, 2012 WL 641579 (D. Ariz. Feb. 28, 2012); *Elsevier Ltd. v. Chitika, Inc.*, 826 F. Supp. 2d 398, 402-03 (D. Mass. 2011).

IMAPizza objects that Defendants improperly rely on their declarations (which assert that Dhir downloaded the pictures from the United Kingdom, *see* Dhir Decl. ¶ 6) in posing their extraterritoriality challenge. Pl.'s Opp'n at 20. The Court may not, of course, consider either party's declarations in connection with Defendants' Rule 12(b)(6) motion. Nonetheless, IMAPizza mistakes its burden. While the Court has located no case directly on point, extraterritoriality does not appear to be an affirmative defense. Rather, courts have described domestic infringement as a necessary element of a Copyright Act claim. *See Int'l Diamond Importers, Inc. v. Med Art, Inc.*, No. 15-cv-4045 (KMW), 2017 WL 2839640, at *8-9 (S.D.N.Y. June 29, 2017); *Stevo Design, Inc. v. SBR Mktg. Ltd.*, 919 F. Supp. 2d 1112, 1119 (D. Nev. 2013); *Shropshire v. Canning*, 809 F. Supp. 2d 1139, 1143-44 (N.D. Cal. 2011); *cf. Morrison*, 561 U.S. at 253-54 (explaining that the territorial reach of the securities laws goes to "whether the allegations the plaintiff makes entitle him to relief"); *Litecubes, LLC v. N. Light Prods., Inc.*, 523 F.3d 1353, 1363 (Fed. Cir. 2008) ("[A] limitation on the extraterritorial scope of a statute is no different than any other element of a claim which must be established before relief can be

granted under a particular statute.").  Therefore, it is IMAPizza's obligation to plead specific facts that support a plausible inference of domestic infringement.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Arguably, a plaintiff may be excused from specifically alleging where the infringement occurred if the defendant's residence or principal place of business is in the United States.  *See Aalmuhammed v. Lee*, 202 F.3d 1227, 1238 (9th Cir. 2000) (decided pre-*Iqbal*). Here, IMAPizza's allegations are insufficient given the undisputed fact that Defendants (and presumably, their computers) reside in the United Kingdom.  *See* Compl. ¶¶ 7-9.  It is possible, of course, that one of the Defendants may have downloaded the images during one of the alleged trips to the United States.  But mere possibility is not enough.  The facts alleged in the complaint must "nudge[]" this possibility "across the line from conceivable to plausible."  *Iqbal*, 556 U.S. at 680 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Based on the facts in the complaint, one could only speculate that the downloads occurred in the United States.

IMAPizza also relies on cases holding that, if even *part* of an act of infringement occurs in the United States, then the conduct is subject to federal copyright law.  Pl.'s Opp'n at 21-22 & n.7.  There is certainly authority supporting this proposition.  *See generally Shropshire*, 809 F. Supp. 2d at 1145-47 (discussing cases in support of, but also some inconsistent with, this proposition).  But this principle, assuming it is correct, is irrelevant.  It typically comes into play in cases involving the exclusive rights to distribute, display or perform copyrighted works.  *See, e.g.*, *Spanski*, 888 F.3d at 916; *Shropshire*, 809 F. Supp. 2d at 1145-46.  Those rights involve at least two people: one distributing, displaying or performing the work, and another (or more) receiving it.  In today's digital world, those people may be in far-flung places.  By contrast, it is usually easy to pinpoint where copies were made.  *See Update Art*, 843 F.2d at 73.  Here, that occurred in Defendants' computers overseas.

Finally, IMAPizza cites a case finding domestic copyright violations where foreign plaintiffs hacked into U.S. servers. Pl.'s Opp'n at 22 n.7 (citing *Synopsys, Inc. v. Ubiquiti Networks, Inc.*, No. 17-cv-561 (WHO), 2017 WL 3485881, at \*26-27 (N.D. Cal. Aug. 15, 2017)). Tellingly, that case did not involve a traditional copyright claim, but claims for circumvention of copyright protection systems under the Digital Millennium Copyright Act. *See Synposys*, 2017 WL 3485881, at \*5 (citing 17 U.S.C. § 1201). It has no bearing on how to evaluate whether a reproduction claim under 17 U.S.C. § 106(1) is improperly extraterritorial.

For these reasons, IMAPizza has not alleged a domestic act of infringement, meaning that its federal copyright claims must be dismissed for failure to state a claim.

### 2. Lanham Act (Third and Fourth Causes of Action)

Defendants also argue that IMAPizza improperly seeks to hold them liable under the Lanham Act for conduct that occurred entirely overseas. Defs.' Br. at 19-21. Here too, the Court agrees.

As an initial matter, the parties dispute whether this issue goes to the Court's subject matter jurisdiction. *See* Defs.' Br. at 19; Pl.'s Opp'n at 22. Neither party has identified binding authority on this issue. The Court is persuaded by the Ninth Circuit's analysis in *Trader Joe's Co. v. Hallatt*, 835 F.3d 960 (9th Cir. 2016), which concluded that extraterritoriality does not go to subject matter jurisdiction over Lanham Act claims, but to the merits of such claims. *See id.* at 966-69. *But see, e.g.*, *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 306-09 (5th Cir. 2008) (treating issue as one of subject matter jurisdiction). Accordingly, Defendants' motion to dismiss these claims must be evaluated under Rule 12(b)(6).

The Supreme Court examined the extraterritorial application of the Lanham Act in *Steele v. Bulova Watch Co.*, 344 U.S. 280 (1952). The defendant in that case manufactured and sold watches in Mexico that infringed on the plaintiff's trademark. *Id.* at 284-85. The Court

concluded that this conduct was actionable under the Lanham Act.  *Id.* at 285.  The Court started from statutory language extending the Act to "all commerce which may lawfully be regulated by Congress."  *Id.* at 284 (quoting 15 U.S.C. § 1127).  It reasoned, first, that the defendant was a U.S. citizen, and that "the United States is not debarred by any rule of international law from governing the conduct of its own citizens" abroad.  *Id.* at 285-86 (quoting *Skiriotes v. Florida*, 313 U.S. 69, 73 (1941)).  The Court also noted that the defendant had purchased component parts of the watches in the United States, and that infringing watches had "filtered" through the border into the United States.  *Id.* at 286.  Thus, the defendant's "operations and their effects were not confined within the limits of a foreign nation."  *Id.*  The Supreme Court has since interpreted *Steele* to hold that the Lanham Act has some extraterritorial application.  *Morrison*, 561 U.S. at 271 n.11 (citing *Arabian Am. Oil Co.*, 499 U.S. at 252).

Several courts of appeals, applying *Steele*, have adopted various tests for when the Lanham Act applies to conduct abroad.  *See* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 29:58 (5th ed. 2018).  These courts disagree on how great an effect the defendant's conduct must have on U.S. commerce: some require a "substantial" effect, others a "significant" effect, and at least one (the Ninth Circuit) only "some" effect.  *Id.*  They also disagree on how much weight to give the defendant's citizenship.  *See id.*  The D.C. Circuit does not appear to have adopted any of these tests.

In the absence of guidance from the D.C. Circuit, the parties dispute which test should apply.  Defendants argue for the relatively stringent test that the First Circuit has applied to cases involving defendants that are not U.S. citizens.  Defs.' Reply at 15 (citing *McBee v. Delica Co.*, 417 F.3d 107, 120 (1st Cir. 2005)).  IMAPizza argues for the Ninth Circuit's more generous approach.  Pl.'s Opp'n at 22 (citing *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d

406, 428 (9th Cir. 1977)).  The Court finds no need to choose among these different tests, because IMAPizza's claims are obviously deficient under any test.

Unlike *Steele*, this is a case where Defendants' "operations and their effects" are entirely "confined within the limits of a foreign nation."  344 U.S. at 286.  Defendants are not U.S. citizens.  Compl. ¶¶ 7-9.  Their business, @pizza, operates solely in Scotland.  *Id.* ¶¶ 7, 33.  As a single pizza restaurant, it is a quintessentially local business.  Unsurprisingly, then, there is no allegation that Defendants have made any purchases of supplies or sales of pizza in the United States, or even that their products or advertisements have entered the United States through the stream of commerce.  Thus, it does not matter whether one requires a "substantial" effect, "significant" effect, or "some" effect on U.S. commerce.  In this case, there is no plausible effect. *Cf. Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 613 (9th Cir. 2010) (affirming dismissal where infringing CDs were never distributed in the United States and could not plausibly have decreased plaintiff's U.S. ticket sales); *Gallup, Inc. v. Bus. Research Bureau (Pvt.) Ltd.*, 688 F. Supp. 2d 915, 922 (N.D. Cal. 2010) (dismissing Lanham Act claim where the defendant was "a citizen and resident of Pakistan" who had "no business connections with the United States," and his business operated "solely within the country of Pakistan and [did] not sell or advertise services in the United States").

IMAPizza tries its best to conjure up an effect on U.S. commerce.  It alleges that many "25-34 year olds" visit Edinburgh from the United States every year.  Compl. ¶ 65(a).  These tourists are allegedly from @pizza's "target demographic" and thus likely to visit Defendants' restaurant.  *Id.*  And they are also, in IMAPizza's view, likely to be familiar with &pizza and, thus, to experience consumer confusion.  *Id.*  Moreover, IMAPizza claims, "a substantial number of university students in Edinburgh come from U.S. states in which &pizza is located."  *Id.*

¶ 65(b).  IMAPizza also claims to have "devoted substantial resources into expanding into the U.K.," *id.* ¶ 12, "including engaging in discussions with potential business partners there and applying for a trademark registration for &pizza on February 24, 2016," *id.* ¶ 51.  Thus, IMAPizza claims, "upon &pizza's active expansion of restaurants into the U.K., customers will be likely to believe that the two restaurants are associated."  *Id.* ¶ 60.  On the basis of all this, IMAPizza argues that "Defendants' conduct is interfering with &pizza's foreign expansion, confusing U.S. consumers, and intentionally harming a U.S. business and its goodwill."  Pl.'s Opp'n at 24.

These allegations, however, do not "raise a right to relief above the speculative level." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Twombly*, 550 U.S. at 555).  IMAPizza provides no concrete facts suggesting an effect on U.S. commerce, only supposition drawn from the unremarkable fact that U.S. tourists and university students—some of whom may live in markets where IMAPizza operates—visit Edinburgh, Scotland.  If that were enough to state a claim, then the Lanham Act would extend to all commercial conduct occurring anywhere in the world that American tourists visit in significant numbers.  IMAPizza cites no case suggesting such a broad application of the Act.

Nor is the Court persuaded by IMAPizza's claim that Defendants are "interfering with &pizza's foreign expansion."  Pl.'s Opp'n at 24.  The fact is that IMAPizza has not expanded to the United Kingdom.  And unless it expands to Edinburgh specifically, it may never be in competition with @pizza.  Here too, the claimed effect on U.S. commerce is simply speculative.

The one non-speculative instance of confusion identified in the complaint concerns a "potential business partner of @pizza."  Compl. ¶ 22.  IMAPizza alleges that this business partner "contacted &pizza to report the infringing use and the frustration experienced as a result

of the potential partner actually being confused into believing that @pizza was affiliated with the well-established &pizza." *Id.* But IMAPizza does not allege any harm from this incident. It does not claim that it wanted to do business with this unidentified party, or that it *ever* lost *any* business to @pizza as a result of this episode or any other. And perhaps most critically, IMAPizza does not allege that this "potential business partner" was located in the United States. *See id.* In short, the Court cannot plausibly infer that this isolated incident shows an effect on U.S. commerce.

Finally, the cases that IMAPizza cites are distinguishable. In *Warnaco Inc. v. VF Corp.*, 844 F. Supp. 940 (S.D.N.Y. 1994), the plaintiff (an American business) and the defendants (one of which was also an American business) entered into agreements (governed by New York law) regarding licensing overseas, and the breach of those agreements diverted sales that would have gone to the plaintiff. *Id.* at 950-52. Here, Defendants are all foreign citizens, and there is no allegation of diverted sales. In fact, it is hard to see how a pizza shop in Edinburgh could divert sales from restaurants in the United States. In *Kroma Makeup EU, Ltd. v. Boldface Licensing + Branding, Inc.*, No. 6:14-cv-1551, 2015 WL 1708757 (M.D. Fla. Apr. 15, 2015), all of the defendants were U.S. citizens, their business was operated "entirely from within the United States," and the court inferred from the defendants' extensive online sales that infringing products had reached the United States. *Id.* at *9-12. And while the court relied in part on the existence of "global consumer confusion" in its analysis, it expressly noted that "global consumer confusion is insufficient by itself to sustain a finding of a substantial effect; there must

be other connections to U.S. commerce." *Id.* at *10. Thus, these cases are entirely distinguishable.[8]

     In sum, IMAPizza's Lanham Act claims must be dismissed.

### 3.    Trespass (Fifth Cause of Action)

     IMAPizza alleges that Defendants committed a trespass under the common law of the District of Columbia by entering &pizza restaurants. Compl. ¶¶ 79-87. "The tort of trespass is defined as 'an unauthorized entry onto property that results in interference with the property owner's possessory interest therein.'" *Greenpeace, Inc. v. Dow Chem. Co.*, 97 A.3d 1053, 1060 (D.C. 2014) (emphasis omitted) (quoting *Sarete, Inc. v. 1344 U St. Ltd. P'ship*, 871 A.2d 480, 490 (D.C. 2005)). Defendants argue that IMAPizza has not plausibly alleged an *unauthorized* entry, because its restaurants are open to the public. Defs.' Br. at 15-16; Defs.' Reply at 2-6. The Court agrees.

     Neither party has identified binding authority that controls the viability of this claim. Therefore, this Court's obligation is to predict how the District of Columbia Court of Appeals would decide the issue. *See In re Stevenson*, 789 F.3d 197, 201-02 (D.C. Cir. 2015). That court has treated the Second Restatement of Torts as persuasive authority in applying the law of trespass, *see, e.g.*, *Lacy v. Sutton Place Condo. Ass'n, Inc.*, 684 A.2d 390, 394 (D.C. 1996)), consistent with its general practice of looking to the Restatements in applying the common law, *see, e.g.*, *In re Nace*, 98 A.3d 967, 975-76 (D.C. 2014) ("Although we are not required to follow

---

[8] IMAPizza also cites *MGM Resorts International v. Unknown Registrant of www.imgmcasino .com*, No. 2:14-cv-1613 (GMN) (VCF), 2015 WL 5674374 (D. Nev. July 8, 2015), *report and recommendation adopted*, 2015 WL 5682783 (D. Nev. Sept. 23, 2015). The Court finds this case of limited persuasive value. It was decided on default judgment without the benefit of briefing from the defendant, who had not appeared. *See id.* at *1. In any event, it too is distinguishable. The court held that the defendant operated an "interactive website" that was "essentially a storefront for U.S. consumers." *Id.* at *4, *8. Here, there is no allegation that Defendants ever advertised in the United States or otherwise sought out U.S. customers.

the Restatement, we should generally do so where we are not bound by the previous decisions of this court or by legislative enactment, . . . for by so doing uniformity of decision will be more nearly effected." (alteration in original) (quoting *District of Columbia v. Tulin*, 994 A.2d 788, 797 n.10 (D.C. 2010)).  Therefore, the Court relies on Second Restatement of Torts here, as well as persuasive authority from other jurisdictions.

A plaintiff cannot recover for trespass if he consented to the defendant's entry onto his property.  *See* Restatement (Second) of Torts §§ 167, 892A(1) (Am. Law Inst. 1965-1979). "If words or conduct are reasonably understood by another to be intended as consent, they constitute apparent consent and are as effective as consent in fact."  *Id.* § 892(2); *accord Doe v. District of Columbia*, 206 F. Supp. 3d 583, 625 (D.D.C. 2016).  This objective test guards against unreasonable trespass claims.  A property owner cannot invite someone onto his land, then sue that person for trespass because of a secret, unexpressed disagreement with that person's presence.

As is obvious from the complaint, &pizza restaurants—like pizza restaurants generally— are open to the public.  *See supra* p. 25.  Indeed, this entire case is predicated on the claim that IMAPizza is trying to attract the public to its restaurants through its branding, and that Defendants are interfering with those efforts.  *See, e.g.*, *id.* ¶ 56.  IMAPizza does not dispute the basic fact that it allows the public into its restaurant as customers.  *See* Pl.'s Opp'n at 13-15. Instead, it alleges in conclusory fashion that Defendants' entry onto the premises was "without authorization."  Compl. ¶ 81.  But this allegation lacks "facial plausibility," because IMAPizza has provided no "factual content" to support it.  *Iqbal*, 556 U.S. at 678.  It does not allege, for example, that Defendants entered private areas of the restaurants, broke in after hours, or remained after being asked to leave.  Instead, this allegation appears to rest on IMAPizza's

unexpressed wish that potential competitors stay out of its restaurants.  But as already explained, IMAPizza cannot invite the public in, and then rely on its unexpressed preferences to single out Defendants as trespassers after the fact.

IMAPizza repeatedly falls back on its theory that Defendants were "posing" or "masquerading as customers" (implicitly acknowledging that it let them in on that basis). Compl. ¶¶ 25, 82; Pl.'s Opp'n at 14.  This theory rests on the flawed assumption that someone can be either a competitor or a customer, but not both.  In fact, when Dhir patronized IMAPizza's restaurants, he was both a competitor *and* a customer.  As such, IMAPizza consented for him, like all its other customers, to enter.

In a similar vein, IMAPizza suggests that Defendants' hidden purpose—to steal its intellectual property—vitiated its consent for them to enter.  Compl. ¶ 82; Pl.'s Opp'n at 14-15. It analogizes to cases in which consent was procured by fraud.  Pl.'s Opp'n at 14-15 (citing *Democracy Partners v. Project Veritas Action Fund*, 285 F. Supp. 3d 109, 119 (D.D.C. 2018); *Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz* ("*CAIR*"), 793 F. Supp. 2d 311, 345 (D.D.C. 2011)).  That is, the theory goes, IMAPizza surely would not have consented to Defendants' presence if it knew their true purpose.  But a fraud argument cannot succeed under the facts alleged.

It is true that consent may be invalid when it is induced by a substantial mistake or fraud. Restatement (Second) of Torts § 892B(2).  But there is an important limitation on this principle: the mistake or fraud must "concern[] the nature of the invasion of [the plaintiff's] interests or the extent of the harm to be expected from it."  *Id.*  The Second Restatement of Torts helpfully illustrates this principle with two examples concerning the law of battery.  That tort protects individuals against harmful or offensive physical contact.  *See id.* §§ 13-20.  Consent is a defense

to battery, as it is to trespass. *Id.* §§ 49, 167. Sexual contact is not a battery if both parties

consent, but that consent would be vitiated if one party knew, but did not disclose, that he had a

sexually transmitted disease. *Id.* § 892B illus. 5, 11. That is because the tort of battery protects

the plaintiff's interest in bodily integrity, which would be harmed by this omission. By contrast,

if two people agreed to exchange money for sex, a battery would not occur simply because one

party used counterfeit bills to pay. *Id.* illus. 9, 12. A mistake about the nature of the money

would not invade any interest that the tort of battery is intended to protect. (That conduct would,

of course, violate several other laws.) This analysis applies equally to the tort of trespass. *See*

*id.* § 167; *id.* § 892B cmts. g-h & illus. 10, 12.

This limitation serves an important function in the trespass context. As Judge Posner

explained in *Desnick v. ABC*, 44 F.3d 1345 (7th Cir. 1995), "[t]he fact is that consent to an entry

is often given legal effect even though the entrant has intentions that if known to the owner of the

property would cause him for perfectly understandable and generally ethical or at least lawful

reasons to revoke his consent." *Id.* at 1351. Any other result would be unworkable:

> [A] restaurant critic could not conceal his identity when he ordered
> a meal, or a browser pretend to be interested in merchandise that
> he could not afford to buy. Dinner guests would be trespassers if
> they were false friends who never would have been invited had the
> host known their true character, and a consumer who in an effort to
> bargain down an automobile dealer falsely claimed to be able to
> buy the same car elsewhere at a lower price would be a trespasser
> in the dealer's showroom.

*Id.*

The *Desnick* court applied this reasoning to a "hidden-camera" case. A television

producer had dispatched "test patients" to a medical clinic, secretly arming them with cameras

that recorded their examinations. *Id.* at 1348. Judge Posner reasoned that this was not a trespass,

even though the test patients had entered under false pretenses: they had "entered offices that

were open to anyone expressing a desire for [medical] services," had captured only "professional, not personal, communications," and thus had not invaded "any of the specific interests that the tort of trespass seeks to protect." *Id.* at 1352.

Here, the fact that Defendants entered a *public* space makes any fraud or mistake about their intentions irrelevant to the issue of consent. *See Democracy Partners*, 285 F. Supp. 3d at 119 (noting courts have not found trespass where defendants used misrepresentation to gain access to public places). IMAPizza's claimed injury results from the fact that Defendants, by entering its restaurants, accessed its intellectual property and other information about how its business works. *See* Compl. ¶ 82. But IMAPizza has exposed that information by placing it in the publicly accessible areas of the restaurants. Indeed, the whole point of the intellectual property at issue is to attract customers to &pizza restaurants by creating an attractive and distinctive "vibe." *See, e.g.*, *id.* ¶¶ 11-15. While the tort of trespass protects the plaintiff's interest in hiding information he has secreted away on private areas of his property, it quite clearly does not protect any interest in information that the plaintiff has knowingly made public. *See Desnick*, 44 F.3d at 1352-53; *Am. Transmission, Inc. v. Channel 7 of Detroit, Inc.*, 609 N.W.2d 607, 614 (Mich. Ct. App. 2000). Thus, assuming Defendants did indeed misrepresent their intentions, that misrepresentation did not concern the nature of the invasion of plaintiff's property interest and could not have vitiated IMAPizza's consent for them to enter.

The cases that IMAPizza cites are distinguishable on this very basis. *See* Pl.'s Opp'n at 14-15. In *CAIR*, one of the defendants secured an internship at a Muslim advocacy organization based on a fictitious identity and resume, without disclosing his true intention of stealing documents and information from the organization (which he proceeded to do after being hired). 793 F. Supp. 2d at 317-18. The organization sued for trespass, and expressly alleged that its

offices were not open to the general public. *Id.* at 344.[9]  Similarly, in *Democracy Partners*, the

defendants used fictitious names to infiltrate a political consultant's offices (expressly alleged,

once again, to be private spaces not open to the general public) as donors and interns, and took

advantage of their access to steal confidential information.  285 F. Supp. 3d at 112-13, 118-19.

IMAPizza argues, based on *Democracy Partners*, that Judge Posner's opinion in *Desnick*

is inconsistent with District of Columbia law.  *See* Pl.'s Opp'n at 14; ECF No. 30 at 4-5.  The

Court disagrees.  *Democracy Partners* did not reject *Desnick*; it rejected the defendants'

argument (citing *Desnick*) that the plaintiff had failed to make out the "interference with the

plaintiff's possessory interest" element of a trespass claim.  285 F. Supp. 3d at 119-20.

*Desnick*'s relevance to this case, however, lies in deciding whether IMAPizza's consent is

vitiated by fraud, which goes to the "unauthorized entry" element of trespass.  As explained

above, *Desnick*'s holding on that issue is consistent with the Second Restatement, a persuasive

authority when interpreting District of Columbia common law.  And in fact, *Democracy*

*Partners* expressly acknowledged cases holding (consistent with *Desnick*) that

misrepresentations made to procure access to public spaces do not vitiate consent.  285 F. Supp.

3d at 119.

Finally, IMAPizza argues in its opposition that some of Defendants' activities exceeded

the scope of its consent.  Pl.'s Opp'n at 14-15.  These activities included taking pictures of the

restaurants and bringing employees there to show them how &pizza franchises operate.  *Id.*  But

---

[9] The *CAIR* court expressed reservations about whether the plaintiff was required to allege that
its offices were closed to the public to state a claim for trespass.  *See* 793 F. Supp. 2d at 344.  But
that case involved a private organization's offices, which typically would not be open to
members of the public.  By contrast, it is not plausible to infer that a pizza restaurant is closed to
the public where the plaintiff has not alleged otherwise.  And in fact, the complaint contains facts
showing that &pizza restaurants are open to the public.  *See supra* p. 25.

IMAPizza nowhere alleges that it told customers they could not engage in these activities in the public areas of its restaurants. That would not be fatal if it were commonly understood that restaurant patrons exceed the scope of their consent whenever they take pictures or bring their employees with them to lunch. "Even when no restriction is specified[,] the reasonable interpretation of the consent may limit it to acts at a reasonable time and place, or those reasonable in other respects." Restatement (Second) of Torts § 892A cmt. g. IMAPizza has not, however, identified any case law suggesting that any such restrictions customarily apply in the restaurant context. In fact, that result would be inconsistent with *Desnick*, which (without expressly addressing a scope-of-consent theory) declined to find a trespass based on the use of hidden cameras. *See* 44 F.3d at 1352. And common sense suggests that, if a restaurant has not forbidden customers to take pictures, customers who do are not liable for trespass (although that may give the staff a reason to ask them to leave).

Tying all this together, the Court concludes, as a matter of law, that if a restaurant has opened itself to the public, then its consent to enter reasonably extends to competitors as well— even if they harbor an ulterior motive of studying the restaurant for their own gain. In addition to being a correct statement of law, this conclusion also reflects sound policy in a free economic system like ours. "A competitor can and must shop his competition for pricing and examine his products for quality, components, and methods of manufacture." *E.I. duPont deNemours & Co. v. Christopher*, 431 F.2d 1012, 1016 (5th Cir. 1970). Of course, the restaurant could revoke its consent, and it would have a claim for trespass if the competitor refused to leave. Restatement (Second) of Torts § 892A(5) & cmt. i. But the mere fact that the competitor chose to engage in unfair competition outside the restaurant would not make her a trespasser inside, because scouting out a competitor is fair game.

Put more simply: it is not the law that a businessperson, by entering a public establishment to check out the competition, commits a trespass. Because that is the result that IMAPizza seeks, this claim must be dismissed.

## C.     *Forum Non Conveniens*

As a result of the foregoing analysis, the only remaining claim is IMAPizza's claim for "passing off" under the law of the United Kingdom.[10]  Defendants raised *forum non conveniens* in their reply.  Defs.' Reply at 25.  To avoid unfair prejudice to IMAPizza, the Court authorized it to submit a surreply on this issue (along with two others).  ECF No. 36.

"The forum non conveniens analysis calls for the court to consider '(1) whether an adequate alternative forum for the dispute is available and, if so, (2) whether a balancing of private and public interest factors strongly favors dismissal.'"  *de Csepel v. Republic of Hungary*, 714 F.3d 591, 605 (D.C. Cir. 2013) (quoting *Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934, 950 (D.C. Cir. 2008)).  When the plaintiff sues at home, "there is ordinarily a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum."  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981).  "[E]ither private interest factors or public interest factors may be cause for dismissal."  *Jackson v. Am. Univ., in Cairo*, 52 F. App'x 518, 518 (D.C. Cir. 2002).

The Court agrees with IMAPizza that Defendants have not met their burden, on two fronts.  *See* Pl.'s Surreply at 6-8.  First, the "defendant bears the burden of proving that there is

---

[10] Defendants argue that the Court could decline to exercise supplemental jurisdiction over this claim.  *See* Defs.' Br. at 21-22.  But that argument fails because IMAPizza has also asserted diversity jurisdiction over it.  *See* Compl. ¶ 3.  Of course, if IMAPizza fails to submit facts that establish its domestic citizenship, *see infra* Section IV, the Court will revisit this issue.  The Court notes that Defendants have not challenged the Court's exercise of supplemental jurisdiction over the trespass claim.

an adequate alternative forum." *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 677 (D.C. Cir. 1996), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010). This typically includes an obligation to introduce affidavits or other evidence. *See id.* Defendants have provided no information or evidence regarding the adequacy of Scotland as an alternative forum. Defs.' Reply at 25. Second, Defendants also bear the burden of persuasion on the private and public interest factors. *El-Fadl*, 75 F.3d at 677. However, they have provided only a short paragraph of argument that does not address these factors. Defs.' Reply at 25.

Based on this record, the Court has no choice but to deny Defendants' request for dismissal under the doctrine of *forum non conveniens*. That does not mean, however, that dismissal is unwarranted. It simply means that the record is too thin to support dismissal for *forum non conveniens* at this time. Therefore, the denial is without prejudice.

## IV.    Further Proceedings

As noted above, there are factual questions regarding the existence of personal jurisdiction in this case. The Court must resolve those questions before the merits of this case can proceed further. *See Kaplan*, 896 F.3d at 511. But it need not do so before addressing the issue of *forum non conveniens*. "A district court . . . may dispose of an action by a *forum non conveniens* dismissal, bypassing questions of subject-matter and personal jurisdiction, when considerations of convenience, fairness, and judicial economy so warrant." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 432 (2007).

The Court concludes, in its discretion, that the parties should address the issue of *forum non conveniens* before any other proceedings in this action occur. Both *forum non conveniens* and personal jurisdiction are aimed, among other things, at avoiding unfairness that might result from requiring foreign defendants to litigate in our courts. But adjudicating personal jurisdiction would require costly jurisdictional discovery and a possible evidentiary hearing, while *forum non*

*conveniens* can be disposed of through briefing and affidavits (and, if appropriate, a motion hearing). Resolving *forum non conveniens* first has the potential, if dismissal is warranted, to reduce the burden on the Court and the foreign defendants.

Accordingly, the Court will order the parties to propose a schedule for a renewed motion to dismiss on the ground of *forum non conveniens*.

In addition, IMAPizza will be required to submit an affidavit addressing its citizenship for diversity purposes. IMAPizza asserts that the Court has diversity jurisdiction over its "passing off" claim against the foreign Defendants, *see* Compl. ¶ 3, on the basis that it is "a limited liability company of Delaware with its principal place of business" in the District of Columbia, *id.* ¶ 6. But these allegations are insufficient to establish IMAPizza's citizenship. Because IMAPizza is a limited liability company, it has the citizenship of each of its members for diversity purposes. *See CostCommand, LLC v. WH Administrators, Inc.*, 820 F.3d 19, 21 (D.C. Cir. 2016). "The citizenship of the members of an LLC is traced all the way through—that is, when a member of an LLC is itself an LLC [or other unincorporated association, such as a partnership], the citizenship[s] of the members of *that* LLC [or other unincorporated association] are relevant for diversity purposes, and so on." *Jakks Pac., Inc. v. Accasvek, LLC*, 270 F. Supp. 3d 191, 195 (D.D.C. 2017) (citing *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012)), *aff'd*, 727 F. App'x 704 (D.C. Cir. 2018); *see also Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009) (explaining that courts must determine the citizenship of each "sub-member" of a limited liability company). Therefore, IMAPizza shall file an affidavit setting out facts sufficient to establish its citizenship for diversity purposes.

**V. Conclusion and Order**

For all of the above reasons, Defendants' Motion to Dismiss (ECF No. 18) is

**GRANTED IN PART** and **DENIED IN PART**.  IMAPizza's first, third, fourth and fifth causes

of action are **DISMISSED** for failure to state a claim on which relief can be granted.  The parties

shall meet, confer, and file with the Court a proposed schedule for briefing on a renewed motion

to dismiss the remaining cause of action on the ground of *forum non conveniens* by **October 1,**

**2018**.  Defendants' answer shall not be due until 14 days after the Court resolves their renewed

motion to dismiss.  Finally, IMAPizza shall file an affidavit setting forth sufficient facts to

establish its citizenship for diversity purposes by **October 1, 2018**.

    **SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 24, 2018